UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MANUEL DEJESUS ROSAS,

        Petitioner,

    v.

JAMES ROBERTSON, Warden,

        Respondent.

Case No.  22-cv-07765 EJD (PR)

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY; DIRECTIONS TO CLERK**

      Petitioner filed a pro se petition for a writ of habeas corpus under 28 U.S.C. § 2254 challenging his state conviction.  The Court found the petition, Dkt. No. 1, stated cognizable claims which merited an answer from Respondent.  Dkt. No. 6.  Respondent filed an answer on the merits.  Dkt. No. 9.  Petitioner did not file a traverse although given ample time and opportunity to do so.  For the reasons set forth below, the Petition for a Writ of Habeas Corpus is **DENIED**.

## I.  BACKGROUND

      On March 16, 2011, in Santa Cruz County Superior Court (Case No. WF00933), a jury found Petitioner guilty of murder (Cal. Penal Code § 187(a)) and attempted murder (Cal. Penal Code §§ 187(a), 664), found true that Petitioner personally and intentionally used a firearm in committing both counts (Cal. Penal Code § 12022.53(d)-(e)), and found that Petitioner committed the charged offenses for the benefit of a criminal street gang (Cal. Penal Code § 186.22(b)).  Ex. D at 2.[1]  The trial court sentenced Petitioner to a total

---

[1] All references to exhibits are to Respondent's exhibits in support of their Answer.  Dkt. No. 9-3 (Exs. A-H).

1    term of 94 years and eight months to life in state prison.  Id.  On November 16, 2016, the

2    California Court of Appeal reversed the judgment because the trial court committed state

3    law error.  Id.

4         The matter was retried in 2018.  Ex. D at 2.  The jury found Petitioner guilty of

5    murder and attempted murder, and found true the firearms and gang enhancements.  Ex. D

6    at 1.  The trial court sentenced Petitioner to an aggregate term of 65 years to life in state

7    prison, plus a consecutive term of 19 years.  Id.

8         On May 11, 2021, the California Court of Appeal affirmed the judgment on appeal.

9    Ex. D at 2.  On July 28, 2021, the California Supreme Court summarily denied a petition

10   for review.  Ex. E.

11        On October 23, 2021, Petitioner filed a petition for writ of certiorari in the United

12   States Supreme Court, which denied the petition on December 6, 2021.  Ex. H.

13        On December 6, 2022, Petitioner filed the instant federal habeas action.  Dkt. No. 1.

## II.  STATEMENT OF FACTS

         The following summary of Petitioner's offenses are taken from the California Court

of Appeal opinion on appeal after the retrial:

### A.  Overview of the Crimes

         On May 13, 2005, W.M. was shot and killed in a drive-by shooting on Palm
         Avenue in Watsonville. W.M.'s friend, D.A., was also shot, but he survived.
         The prosecution theorized that W.M.'s murder was the result of an ongoing
         gang war between two Norteño gangs, City Hall and Northside Watsonville,
         and that defendant, a City Hall gang member, shot D.A. and W.M. as
         retaliation. The prosecution alternatively argued that if defendant was not the
         actual shooter, he was the driver of the car and was guilty as an aider and
         abettor.

### B.  Defendant's Prior Contacts with the Police

         In February 2005, Watsonville Police Department Sergeant Eric Montalbo
         was driving when he saw defendant parked in a burgundy Yukon sports utility
         vehicle (SUV). Sergeant Montalbo saw that there were three other known City
         Hall gang members inside the SUV. Additional officers arrived, the individuals
         were taken out of the car, and the officers found a loaded handgun on the
         SUV's passenger seat. Defendant was arrested and charged with possession of
         a loaded firearm in a vehicle.

United States District Court
Northern District of California

In March 2005, Sergeant Montalbo stopped defendant again while he was driving in burgundy Yukon. The stop was recorded on a video from Sergeant Montalbo's patrol car.

On May 7, 2005, Sergeant Montalbo went to defendant's house to perform a probation search. Inside the house, officers found several City Hall gang members, including Emanual Rodriguez and Dennis Moreno. Defendant was arrested on a warrant, and the other individuals, with the exception of Moreno, were arrested for either parole or probation violations.

### C. The Murder

In 2005, 17-year-old D.A. was best friends with 18-year old W.M. [FN2 D.A. was 29 years old at the time of defendant's trial in 2018, and he testified that W.M. was about a year older than him.] D.A. noticed that W.M. associated with people who wore red, which D.A. linked to gang activity, but D.A. did not think that W.M. was involved with gangs. W.M. sold drugs, including marijuana and methamphetamine.

On May 13, 2005, D.A. was at W.M.'s house on Palm Avenue. D.A. and W.M. walked to E.A. Hall Middle School, which was around two blocks from W.M.'s house. W.M. used a bicycle as a wheelchair because he was recovering from a broken leg. D.A. and W.M. met with friends at the school. The group smoked marijuana and tobacco and talked about going to a party. D.A. and W.M. decided not to go to the party and walked back toward W.M.'s house around dusk.

D.A. and W.M. went down Palm Avenue. At a certain point, W.M. started riding his bicycle on the street while D.A. walked on the sidewalk. As D.A. and W.M. passed Minty White School, D.A. saw a burgundy or red SUV come down Palm Avenue. D.A. saw that the SUV driver was a "[b]ig Hispanic guy with a red shirt and facial tattoos." D.A. recalled that the driver had tattoos above his eyebrows that "made his eyebrows look big." The driver looked to be in his mid-20s or early 30s.

The burgundy SUV pulled up next to W.M. who was about eight to 10 feet in front of D.A. The SUVS's front passenger window was open, and the window was parallel to where W.M. was on his bicycle. W.M. looked like he was going to smile, and he had a frown on his face and lifted his chin up. D.A. saw the SUV driver reach down toward the car's center console area, and he briefly saw the barrel of a silver-colored gun. The barrel went away, and D.A. heard gunshots. D.A. did not see a gun come outside the passenger window, and it looked like the gun was fired from inside the car.

D.A. ran forward and was shot. D.A. stopped when he saw W.M. W.M. gave D.A. a "head nod," indicating that D.A. should "get down." D.A. turned around, dove, and tried to crawl over to W.M. D.A. could see the car's front passenger, and he remembered that the passenger had an arm tattoo. He also remembered that the passenger had a gun that was black and "square." [FN3 D.A. told officers about the passenger's gun in 2009, four years after the murder. He did not mention the passenger's gun during his interview on the night of the murder.] The passenger did not shoot his gun. D.A. heard W.M. calling for his mother. D.A. was shot through his lower left side, and the gunshot went through is testicles and into his leg down to his knee. After the shooting, the SUV sped away.

D.A. testified that earlier that night, W.M. had said that he had some concerns because he had "shorted" somebody on a drug deal. After W.M. was shot, D.A. remembered seeing one of their friends, Luis, tough W.M.'s body. D.A. thought that Luis was checking to see where W.M. was shot. [FN4 In an earlier interview with officers, D.A. Said he saw Luis take something from W.M.'s body, but he could not see what was taken.]

D.A. remembered that he spoke to an officer while he was injured at the scene. D.A. testified that he told the officer that he could not give any details about who was in the car, but the car was a red or burgundy SUV.

San Benito Sheriff's Office Captain Eric Taylor testified that he spoke to D.A. at the scene. Captain Taylor recalled asking D.A., "'Who did this?'" D.A. replied, "'I don't know.'" W.M. died at the scene before he could make any statements.

Watsonville Police Department Officer Juan Rocha was also dispatched to the scene. When Officer Rocha arrived, he saw D.A. lying on the ground. Officer Rocha asked D.A. what happened. D.A. said that a red or burgundy Suburban-type SUV had driven past him and W.M. The car turned back and pulled up next to them, and D.A. head someone say, "'What's up, fools?'" D.A. then heard gunshots. D.A. said that he never saw a gun, and he did not see anyone inside the car.

### D. Witnesses Seeing a Burgundy SUV on May 13, 2005

Around dusk on May 13, 2005, N.M. was in a car with his father and a friend when a burgundy SUV cut them off. N.M.'s father thought it would be a good idea to "call in[the] reckless driving" because the car "skid[ded] out a little bit" when it cut them off, and they were in a residential neighborhood. After they arrived at N.M.'s house, N.M. heard some "popping noises," and a few seconds later, the same burgundy SUV accelerated by.

J.C. saw a burgundy "Suburban or a GMC" drive recklessly by her house near Palm Avenue on the day of the shooting. One of the car's tires on the driver's side hit the curb near J.C.'s house and the car continued driving. J.C. could tell there were multiple people inside the car.

J.R. lived on Palm Avenue and heard gunshots sometime around 8:00 and 8:30 p.m. that evening. Once she heard the gunshots, J.R. went to her front door window and looked outside. She saw a car quickly coming down the street on Palm Avenue. The car looked like it was a dark-colored "SUV-type vehicle."

### E. Identification of Defendant as a Suspect

D.A. was taken to a hospital after he was shot. At the hospital, D.A. told an officer that a red or burgundy SUV had been involved with the shooting, and the driver wore a red shirt and a black baseball cap. Several days after W.M.'s murder, officers came to D.A.'s house and showed him several photo lineups. D.A. was unable to identify anyone in the lineups. D.A. was later able to give W.M.'s mother a description of the driver. D.A. told W.M.'s mother that the driver was an "[o]verweight male, pretty heavy, red shirt" with "tattoos above his eyebrows."

On May 13, 2005, Sergeant Montalbo was on duty when he heard the report of the shooting on Palm Avenue that involved a burgundy SUV. Back in 2005, Sergeant Montalbo did not know any other gang member in Watsonville the drove a burgundy SUV aside from defendant. Sergeant Montalbo was directed to search for the suspect vehicle, so he drove over to defendant's house. Sergeant Montalbo suspected defendant was involved because of the description of the suspect's car and the fact that defendant was a gang member with a history of firearms. Sergeant Montalbo also knew that there was an ongoing feud between the Northside Watsonville and City Hall gangs at the time of W.M.'s murder. Sergeant Montalbo did not find the burgundy SUV when he went to defendant's house.

### F. The Impounding of the Yukon SUV and Defendant's Flight

In 2005, San Mateo County Sheriff's Department Sergeant Vincent Bedolla was employed as a detective with the Watsonville Police Department and was assigned to investigate the homicide. On May 15, 2005, Sergeant Bedolla learned that another officer was making a traffic stop on a burgundy Yukon SUV, which was possible a suspect vehicle in the homicide investigation. Sergeant Bedolla went to the other officer's location. The other officer was issuing a citation to the SUV's driver, C.R., who had two children with her. C.R. was defendant's sister. Sergeant Bedolla told C.R. that they suspected that the car had been involved in a shooting. C.R. told Sergeant Bedolla that she was the primary driver of the SUV, and on the day of the murder, she had driven the car to the farmers' market and then to Target at around 8:00 p.m. C.R. also said that defendant had not driven the SUV the preceding Friday or that Saturday. C.R. seemed evasive, but she voluntarily accompanied the officers back to the police station. The SUV was seized as evidence.

Sergeant Bedolla interviewed C.R. at the police station and drove her home afterwards. Sergeant Bedolla saw defendant standing inside the garage when he neared C.R.'s house. Sergeant Bedolla parked his car, and C.R. started to walk toward the house. Sergeant Bedolla heard C.R. say something to defendant. Sergeant Bedolla could not make out what C.R. said, but defendant immediately walked away into the house. Sergeant Bedolla called the other detectives assigned to the case and asked if he should make contact with defendant, and the other detectives told him to "stand down."

Approximately five hours later, Sergeant Bedolla returned to the house with five other officers and attempted to make contact with defendant. The officers searched the house, but they were unable to locate defendant. No other evidence was found at the house.

Later, Sergeant Bedolla conducted a search of the SUV. Inside the car, Sergeant Bedolla found paperwork with defendant's name, defendant's driver license, and a receipt that was dated the same day as the murder. Sergeant Bedolla also discovered that the left rear tire was a spare tire, and a flat tire was located inside the back of the car.

At some point, D.A. was also taken to the police station to identify a vehicle that officers had seized. The car was a burgundy Yukon with tinted back windows. D.A. thought that the car looked similar to the car that he saw on the day of the murder. D.A., however, told officers that the car involved with the murder had "chrome striping" on it, and the car at the police station did not.

5

### G. Forensic Analysis

Officers found bullets and bullet fragments at the scene of W.M.'s murder. A forensic analysis of the bullets revealed that the bullets were all .38-caliber and appeared to be fired from the same weapon. A bullet recovered from D.A.'s leg was indistinguishable from the bullets recovered at the scene.

A criminalist analyzed samples taken from the burgundy SUV seized from C.R. and found gunshot residue. The criminalist opined that "the most likely explanation for the distribution of particles" was that a gun was fired by someone sitting in the driver's side of the car, but it was "not necessarily the only explanation." The criminalist also believed that the evidence in the case was consistent with the gun being fired from within the car.

The forensic pathologist who conducted W.M.'s autopsy determined that W.M. had a gunshot wound that entered his left upper arm and went through his chest. The gunshot, which was lethal, went through the left lung, the heart, the right lung, and exited the right chest. W.M. had another gunshot wound that went through the left side of his chest. The forensic pathologist did not visually see gunshot residue on W.M.'s clothing or skin. In his report, the pathologist wrote that W.M. had a "distant gunshot wound of entrance," which meant that the gun was "fired at a distance probably greater than two feet from the surface of the victim's body."

### H. The Reopening of the Case

In 2009, W.M.'s murder remained a cold case and was assigned to Watsonville Police Department Sergeant Jarrod Pisturino. In early September 2009, Sergeant Pisturino was told that defendant had been arrested in South Carolina. Sergeant Pisturino asked his partner, Inspector Morgan Chappell, to assist with the investigation. [FN5 Inspector Chappell later testified as the prosecution's gang expert. Sergeant Pisturino identified Inspector Chappell as a detective with the Watsonville Police Department, but during his testimony, Inspector Chappell stated that he was now an inspector with the district attorney's office.]

Sergeant Pisturino arranged to interview D.A., who was difficult to locate. D.A.'s mother said that he was scared of retaliation. When Sergeant Pisturino first spoke with D.A., D.A. was suspicious and paranoid. D.A. was worried that some of W.M.'s friends may have been involved in his murder. In one interview, D.A. said that the SUV's passenger pointed a gun but did not fire it. D.A. described the driver of the SUV as chubby with tattoos over his eyes. D.A. said that after he was shot, he saw the SUV's passenger hang out of the window with a gun in his hand. D.A. also said that the passenger could have been a person named "Gabe," which was one of W.M.'s friends. At one point, D.A. told officers that he thought that it was the passenger who fired the gunshots.

Sergeant Pisturino and Inspector Chappell traveled to South Carolina and interviewed defendant. Defendant said that after he left Watsonville, he traveled to Wisconsin, then to Mexico, and eventually settled in South Carolina. Defendant said that he did not know who W.M. was.

1

### I. Testimony of Gonzalez, Moreno, and Rodriguez

2

#### i. Gonzalez's Testimony

3    Olegario Gonzalez had been a City Hall gang member since he was 18
4 years old. When Gonzalez met defendant, he understood that defendant was
involved with gangs and was a City Hall gang member. Gonzalez and
defendant "hung out in the same crowd" of City Hall gang members, including
5 Dennis Moreno. Gonzalez's nickname in the gang was "Bandit." Moreno's
nickname was "Menace." Defendant had tattoos that said "Bandit" on his right
6 wrist and "Menace" on his left wrist.

7    On May 13, 2005, defendant picked Gonzalez up in a "burgundy Yukon,
Suburban." Moreno was in the car with defendant. The men drove to Santa
8 Cruz, drinking beer and tequila and smoking marijuana on the way. When they
arrived in Santa Cruz, they bought even more beer and went to a fellow City
9 Hall gang member's house. Gonzalez, who was drunk, stole a neighbor's car
stereo.

10    Afterwards, the men left and headed toward Watsonville. Defendant drove
11 the car, Moreno sat in the front passenger seat, and Gonzalez sat in the middle
back seat. Gonzalez was still drunk. He remembered that there was another
12 person in the car, but he could not remember who that person was. Gonzalez
vaguely remembered that hey dropped someone off when they arrived in
13 Watsonville. At some point, Gonzalez got out of the car and threw up.

14    Defendant continued to drive, and Gonzalez remembered that defendant
15 stopped the car on a street with palm trees. Gonzalez saw two people walking
on the street, including a person who was on a bike. Gonzalez remembered that
16 he saw "a white and a black dude," and the Caucasian man was limping.
Gonzalez remembered that after defendant stopped the car, the Caucasian man
17 said, "'What's up, Manuel?'" At that time, the driver's side was the closest
side to the Caucasian man. Defendant responded, "'You guys trippin' or
18 what?'" Defendant pulled out a silver semi-automatic handgun and shot at the
two men out of the driver's side window. Defendant fired the gun "three or
19 four times, five times" and hit both the "white kid" and the "black kid."
Gonzalez did not know that defendant had a gun with him, and he was shocked
20 at what had happened and did not say anything to defendant. Moreno also did
not say anything to defendant. [FN6 Gonzalez testified that he never saw
21 Moreno with a gun, and he would have remembered if Moreno leaned out of
the car with a gun and said something to W.M.]

22    Defendant quickly drove away from the shooting. As defendant drove,
23 Moreno said, "'He hangs out with Northsiders.'" Defendant hit a bump, but he
kept driving until he reached a house in Las Lomas. Gonzalez did not know the
24 name of the man who lived in Las Lomas, but he knew that the man was a
"Paisano," someone who came from Mexico who was not a gang member. The
25 Paisano wiped down defendant's car with bleach wipes. Gonzalez noticed that
one of the car's tires had separated from the rims, but he did not remember
26 anyone changing the tire out that day.

27    Defendant told the Paisano to call Emanual Rodriguez to find out what had
28 happened because Rodriguez listened to the police scanner. The Paisano called
Rodriguez and told defendant that one person had been killed and another
person had been shot in the testicles. Defendant asked Gonzalez and Moreno to

clean the car. Gonzalez found "maybe three" shell casings and Moreno found "other ones." Gonzalez found the casings in the back of the car across from the center console. Gonzalez used bleach wipes to wipe his fingerprints form the backseat of the car. Gonzalez and Moreno put the shell casings in a bag.

Afterwards, defendant, Gonzalez, and Moreno went back inside the defendant's SUV. Defendant drove the car and followed the Paisano, who drove a truck, to a house across the street near a field. The men cleaned the car a second time and looked for more bullet casings. They wiped the windows with bleach wipes. Afterwards, the Paisano drove the men in his truck to Rodriguez's house. When they arrived, the men told Rodriguez about the shooting, which he already knew about. Gonzalez smoked some marijuana and did a line of "crystal meth." Afterwards, the Paisano dropped Gonzalez off at his house. Gonzalez never saw Moreno or defendant again.

Gonzalez kept the gun used during the shooting, which belonged to Rodriguez. Gonzalez hid the gun in his bathroom for about two weeks. Rodriguez later told him to cut the gun in half. Gonzalez tried to cut the gun in half, but he only managed to scratch it. Gonzalez gave the gun back to Rodriguez, and someone later threw the gun out of a car while the men drove to Moss Landing.

Gonzalez testified that at the time of W.M.'s murder, City Hall was involved in a gang war with another Norteño gang, Northside Watsonville. Gonzalez was upset when his friend and fellow City Hall gang member Isaac Guzman was killed, and he believed that Guzman had been killed by "Northsiders." Gonzalez recalled that City Hall had a meeting following Guzman's murder. At the meeting, City Hall gang members "'got [the] green light on Northsiders,'" meaning that they could "try to take [Northsiders] out" if they saw them.

At some point, Gonzalez learned that a Northside gang member who went by the nickname "Sneaky" got shot. [FN7 Inspector Chappell later testified that "Sneaky" was the gang moniker for a Northside member named Brian Smith.] After the shooting, Rodriguez came over to Gonzalez's house. Rodriguez asked Gonzalez if he could leave his truck at Gonzalez's house because the truck was "hot." Gonzalez told Rodriguez no. Gonzalez pieced together that the shooting that he had learned about had something to do with why Rodriguez wanted to leave his truck at Gonzalez's house.

In 2006, Gonzalez was convicted of receiving stolen property and robbery with the use of a weapon. At the time, he was still a member of City Hall. Gonzalez was paroled in December 2008, but he violated his parole by associating with gang members and went back to prison. He was released from prison in 2009.

At some point in 2009, defendant called Gonzalez and told him that he wanted to go back to California and that he missed his family. Defendant said that he had traveled to "Mexico, Nebraska, like a couple [sic] places." Defendant also said that he had been back in Watsonville several times.

Gonzalez did not speak to defendant again until defendant was in jail sometime in 2009 or 2010. At that time, defendant told Gonzalez, "'A black dude is gonna come and testify. Can you find him and take care of him?'" Gonzalez understood defendant to mean that he did not want the witness to come to court. Gonzalez responded, "'Let me see what I can do.'" Gonzalez,

8

however, did not intend to do anything.

In 2012 or 2013, Gonzalez overheard a conversation where Moreno spoke about a murder in Redwood City. Moreno said that someone named Pablo Hernandez had testified at trial, and Hernandez did not say anything about a murder that took place in Redwood City. [FN8 Based on Gonzalez's statements, Inspector Chappell tried to see if he could find a murder similar to the one Moreno described, but he was unsuccessful.]

In 2014, Gonzalez was arrested for an attempted murder following a drive-by shooting. Gonzalez later provided surveillance videos that showed that he was not in the car that was involved in the drive-by shooting. He subsequently reached an agreement with the district attorney that he would provide information about certain cases, including W.M.'s murder. Gonzalez received a sentence of four years as part of his agreement. He and his family were relocated and were receiving money for rent and food. Gonzalez was also granted immunity in exchange for his testimony.

Gonzalez said that he agreed to cooperate with the district attorney's office because he had changed after he went to jail. Gonzalez said that City Hall had gone "after [his] family." At that point, Gonzalez attempted to become active again with the gang so he could protect his family, but he eventually dropped out of the gang.

### ii. Moreno's Testimony

Moreno grew up in Watsonville and started associating with City Hall gang members when he was around 17 years old. Moreno became a City Hall gang member when he was 19 years old. Moreno was good friends with Isaac Guzman. When Guzman was murdered, City Hall gang members believed that a "Northsider" was responsible for his death. As a result, there was a "war" between the City Hall and Northside gangs. Moreno was also good friends with defendant and Gonzalez.

On May 13, 2005, defendant, Moreno, and Gonzalez went to Guzman's grave site together. After visiting the cemetery, they drove around in defendant's SUV. Moreno sat in the front passenger seat, and Guzman sat in the back seat behind the passenger. There was nobody else in the car.

At some point, defendant started to drive down Palm Avenue. Moreno saw W.M. with "some black guy." Moreno had seen W.M. before, and he thought that W.M. was a Watson Varrio Norte gang member. Watson Varrio Norte was a "farm team" for the Northside gang. W.M. was on a bicycle, and he was "hanging out" on the street.

W.M. and his friend were on the other side of the street, and defendant made a U-turn and stopped near W.M. W.M. came up to the SUV's passenger window right next to Moreno. Defendant said, "'What's up, fucker?'" Before W.M. could respond, defendant shot him with a silver fund. Defendant held the gun in front of Moreno's face near his left eye. Moreno felt gunpowder in his face and heard ringing in his ears. W.M. fell down, and defendant shot W.M.'s friend. Moreno and Gonzalez did not have guns that day.

Gonzalez said, "'You fucked up, Manuel.'" Defendant responded, "'Fuck him, he hangs around with Northside.'" Defendant then accelerated away. Defendant drove to a house in Las Lomas and the three men cleaned the car. Defendant talked to someone inside the house and brought out cleaning spray and a rag to clean the car for gunpowder residue. Defendant swallowed one of the bullets, and he used a water hose to scrub his face and body.

After W.M.'s murder, Moreno started distancing himself from the City Hall gang. Moreno did not know what happened to defendant's gun, and he did not see defendant again. Moreno remembered that defendant had tattoos above his eyebrows at the time that W.M. was murdered.

In 2007, Moreno went to prison for receiving stolen property. He also had a prior conviction for assault. Moreno was in prison for about a year, and it changed the way that he looked at being in a gang. Some of the "lifers" in prison told Moreno that he should be out providing for his family instead of being in prison.

Later, Moreno had a meeting with the district attorney's office about his knowledge of W.M.'s murder. [FN9 Moreno was interviewed by police officers shortly after W.M.'s murder on May 17, 2005. At that time, Moreno told officers that on the day that W.M. was killed, he had gone with his sister and his sister's boyfriend or husband to a mall in San Jose at around 5:00 p.m. and had returned to Watsonville at 10:00 p.m., which is when he learned about the murder. Moreno said that he did not find out the identity of who had been killed until his brother purchased a newspaper the following Monday.] Moreno was subsequently granted immunity for his testimony at trial. Moreno and his family were relocated for their safety, and they were being given money for food and rent.

### iii. Rodriguez's Testimony

In 2005, Rodriguez was a member of the City Hall gang. [FN10 Rodriguez testified that he did not want to come to court to testify against defendant, and he only did so because he was ordered to by the court.] Rodriguez was 18 years old when he joined City Hall, and he was given the nickname "Little Stomper." Rodriguez was not currently an active member of his gang, but he would be considered a "rat" after he testified at trial and would no longer be able to go back to Watsonville. Rodriguez thought of defendant as his brother and had known him for 15 years.

Back in 2004, defendant was a member of the City Hall gang and went by the nickname "Little Vago." Isaac Guzman, a City Hall gang member, was killed in December 2004, and Rodriguez believed that Northside was behind Guzman's murder.

On May 13, 2005, Rodriguez heard over the police scanner that a shooting involving a burgundy SUV had occurred on Palm Avenue. When Rodriguez heard the description of the car over the scanner, he hoped that the shooting did not involve defendant. Rodriguez, however, could not remember anybody coming over to his house after he heard about the shooting on the scanner.

At the time of W.M.'s murder, Rodriguez owned four guns, and one of them may have been a silver .380 semi-automatic gun. The .380 semi-automatic gun was available to be used by any City Hall gang member. Rodriguez could not remember if he ever gave the gun to defendant. At some point, Rodriguez heard that Gonzalez was trying to sell a gun that was involved in a shooting, and he eventually got a gun back from Gonzalez, but he was not sure which gun it was. [FN11 At trial, Rodriguez, testified that he received the gun from Bandit, which is Gonzalez's gang moniker.] Later, Rodriguez went on a fishing trip and tossed the gun that he got from Gonzalez into the ocean. [FN12 At one point, Rodriguez told investigators that his brother said that he knew where the gun was.]

Rodriguez previously told investigators that defendant had once told him that he had shot two people, but he testified at trial that he could not recall making that statement. Rodriguez, however, recalled that he had previously told investigators, "Manuel told me that they didn't mean for anybody to get killed."

Rodriguez had a prior conviction for drunk driving. He testified for the prosecution under a grant of immunity.

### J. Jose Contreras's Testimony

In May 2005, Jose Contreras was friends with Rodriguez and was living in Las Lomas. [FN13 The prosecution's gang expert later testified that Contreras was a drug dealer.] One evening, defendant drove over to his house in an SUV. Defendant was by himself, and he was acting a little nervous. Defendant asked Contreras if he had a water hose. Contreras answered yes and told defendant to part at the back of the house. Contreras used the water hose and helped defendant wash himself. Afterwards, defendant looked through his car as if he was trying to find something. Defendant was at Contreras's house for approximately 15 minutes. Contreras did not remember giving defendant a ride back to Rodriguez's house, and he did not recall giving defendant any sort of cleaning supplies. Defendant mentioned someone that went by the name "D," who lived in an area with lots of fields.

### K. Gang Evidence

#### i. The Norteño and the City Hall Gangs

District Attorney's Office Inspector Chappell had previously worked for the Watsonville Police Department as a gang detective and as a correctional officer at San Quentin State Prison. Inspector Chappell testified for the prosecution as a gang expert.

According to Inspector Chappell, there used to be a one prison gang called the Mexican Mafia that protected Hispanic inmates. However, another group did not like the way the Mexican Mafia treated some Hispanic inmates, so the Nuestra Familia prison gang was created. The Nuestra Familia has a document called "The Constitution," which describes the rules that gang members must follow. The Nuestra Raza prison gang is one tier below the Nuestra Familia. The Nuestra Familia is the "supreme" Norteño gang and sets rules and policies for all Norteños. If a gang member does not follow the rules and is deemed a coward or traitor, the member will be "greenlit" and marked to be assaulted or possibly killed. Gang members are not supposed to testify in court or cooperate

United States District Court
Northern District of California

with the police.

The Mexican Mafia also has rules and regulations that its members are supposed to follow. For example, Sureños are not permitted to commit drive-by shootings; they have to get out of the car before they shoot someone.

Norteños associate with the color red and the number 14. The gang also uses a "huelga" bird as a symbol. There are many Norteño subsets in Watsonville, including City Hall and Northside Watsonville. The primary activities for a gang like City Hall include "robberies, shootings, stabbings, [and] group assaults."

### ii. Predicate Offenses

Inspector Chappell testified about prior convictions of other City Hall members. The certified conviction record for Richard Betancourt ("Devil"), was introduced into evidence. Betancourt was convicted of robbery and attempted robbery with a gang enhancement in November 2003. Moreno and Gonzalez's certified conviction records were also admitted into evidence. Moreno was convicted of burglary in February 2004. Gonzalez was convicted of grand theft in November 2003. Inspector Chappell also testified that on February 23, 2005, Officer Montalbo came across several City Hall gang members inside the Yukon driven by defendant and found a loaded gun inside the car. Sergeant Montalbo had previously testified about the same incident. Inspector Chappell further testified about the shooting of Brian Smith ("Sneaky"), a Northside member, who was shot using the same gun used to kill W.M. as part of a gang war between the two Norteño gangs. Investigators suspected that City Hall was behind Smith's shooting.

### iii. Additional Evidence About the Gang War

Watsonville Police Department Sergeant Eric Montalbo was a patrol officer in 2005. Sergeant Montalbo had extensive experience dealing with gangs in Watsonville, and he knew that there were Norteño and Sureño gangs within the city. Generally, Norteños and Sureños were enemies, and there was an understanding that Norteños should not fight or inflict violence on other Norteño gangs. The gangs, however, did not always abide by those rules. In 2004 and 2005, there was a "war" between two Norteño gangs in Watsonville, City Hall Watson and Northside Watsonville.

According to Sergeant Montalbo, around 2004 and 2005, Isaac Guzman, a City Hall gang member, was stabbed multiple times and killed. Sergeant Montalbo responded to the scene of Guzman's murder. Eventually, investigators developed a suspect for Guzman's murder, Mario Lozano, a Northside Watsonville gang member.

Inspector Chappell also testified about the gang war. According to Inspector Chappell, the gang war started after Lozano, a member of Northside Watsonville was allegedly shot by Guzman. Lozano then murdered Guzman by stabbing him to death with a knife in December 2004. Guzman's murder took place in broad daylight, and someone even took pictures of what happened. Investigators believed that City Hall gang members were responsible for shooting Smith. Inspector Chappell testified that Gonzalez's testimony that Rodriguez came to his house to try to hide a truck shortly after Smith's shooting was consistent with City Hall being involved with the shooting. There

was also evidence that the City Hall gun used to kill W.M. was involved with Smith's shooting.

### iv. W.M.'s Gang Association

Sergeant Bedolla had known W.M. since he was a small child. As W.M. got older, he started associating with people who Sergeant Bedolla knew to be Norteños. Inspector Chappell testified that he believed W.M. was an associate of "Watsonville Norte" based on his review of police reports concerning W.M.

### v. Defendant's Gang Association

Inspector Chappell opined that defendant was an active City Hall member at the time that W.M. was murdered. Chappell's opinion was based on defendant's conduct, the tattoos that he had, the admissions he had made to law enforcement, and the fact that he was in contact with other City Hall members. Defendant had a tattoo over his eyebrows that said, "Watson Locos," and a tattoo on his neck that said, "City Hall Soldier." Defendant also had a filled-in teardrop tattoo in the corner of his left eye, which could mean that he committed a murder or a hit for the gang. Before W.M.'s murder, defendant did not have a filled-in teardrop tattoo. Defendant also had tattoos that said "Bandit," "Menace," and "Little Stomper." Inspector Chappell believed that defendant knew that the City Hall members engaged in criminal activity based on the fact that defendant had been arrested with and had committed crimes with other Norteños and City Hall gang members. Inspector Chappell also testified that committing murder of a perceived rival would garner respect within the gang.

### L. Defendant's Sister's Testimony

In 2005, C.R., defendant's sister, was 17 years old. She lived in Watsonville with her infant son, her siblings (including defendant), her mother, her stepfather, and the family's nanny. C.R. believed that defendant was a City Hall gang member. C.R. was close with her brother, but defendant kept C.R. away from "anything that had to do with gangs."

The family had several cars, including a burgundy or red Yukon SUV. C.R.'s mother often used the SUV to run errands or purchase produce. The family sold items at a farmers' market that was held every Friday.

On May 13, 2005, C.R. arrived home after work at around 3:00 p.m. Defendant was the only adult at home, and he was watching his minor siblings. C.R. drove to the farmers' market using a white Nissan, and she saw that the SUV was parked in the garage when she left. Sometime around 3:00 or 5:00 p.m., C.R.'s mother called defendant and asked him to bring ice to the farmers' market. Defendant drove over in the SUV, dropped off the ice, and left.

C.R. arrived home at around 8:00 p.m. that evening. Defendant was already home, and the burgundy SUV was in the garage. Defendant took a shower and got ready to go out to meet a woman, N.P. N.P. was married to someone else at the time. C.R. drove defendant to the cemetery using the burgundy SUV and dropped him off at around 8:20 or 8:30 p.m. The only person C.R. saw at the cemetery was N.P. When C.R. arrived back home, she parked the SUV in the garage. C.R.'s bedroom was located over the garage, and she would have heard the garage door open if someone had taken the SUV out. The next morning,

C.R. got up at around 9:00 a.m. saw that the SUV was still in the garage.

On May 14, 2005, C.R. drove the SUV to a shopping center to get her hair ready for prom. After she came home, she parked the SUV. The SUV was parked in the same spot when her prom date came to get her, and it was still in the same spot when she came home that evening.

On My 15, 2005, C.R. was stopped by the police while driving the SUV. She had her one-year-old son and her two three-year-old twin brothers with her at the time. C.R. went with the officers to the police station, where she stayed for several hours. She never saw the SUV again. After the car was taken, C.R. was transported home. As she walked toward her house, she saw defendant in the garage. Defendant came out to help C.R. with the children, and he asked where she had been and what had happened to the car. C.R. told defendant that the police had taken the car. Defendant left later that week to see their father in Mexico, who was battling cancer.

On May 20, 2005, C.R. spoke to the police and told them that she had driven the SUV to Target at the time of W.M.'s murder. C.R. later admitted that she had lied to the police. After officers told her that they thought she was lying about going to Target and that they were going to pull surveillance tapes from the Target store to confirm her story, C.R. told officers that she had driven her brother to the cemetery that night. C.R. said she did not tell officers about defendant's meeting with N.P. because N.P. was married at the time.

C.R. previously told the police that her friend, J.H., had called her the evening of the murder and had told her that she had seen defendant driving the burgundy SUV. C.R., however, had initially told the police that J.H. had called her and accused her of being involved with J.H.'s boyfriend.

### M. J.H.'s Testimony

J.H. lived in Watsonville in 2005 and was friends with C.R. In May 2005, she saw a reckless car driving in front of her house. She called C.R. after the car drove by and told C.R. that she thought she had seen C.R.'s mother's car. C.R. told J.H. that her mother's car was at home and defendant was at the cemetery. J.H. knew W.M.; W.M. used to be best friends with the father of J.H.'s children. In 2012, J.H. identified defendant as the driver of the SUV that she saw that evening. At trial, however, J.H. could not remember saying that she thought the driver of the SUV looked like defendant.

### N. N.P.'s Testimony

In 2005, N.P. was married and lived in Watsonville. N.P. was Isaac Guzman's aunt. She met defendant Guzman's funeral and became romantically involved with him sometime in 2005. When they had their affair, N.P. and defendant would meet up two or three times a week during the evenings. N.P. did not remember if she and defendant ever planned out their dates and she remembered that they usually just ran into each other at the cemetery. N.P. knew defendant's sister C.R., and she remembered that C.R. sometimes dropped defendant off at the cemetery. N.P. and defendant's dates would usually end around 9:00 pm. because N.P. had to go back to her husband. N.P. owned a burgundy Yukon.

14

*O. Defense Testimony on Gang Tattoos*

Glenn Rouse, a private investigator, had previously been employed as a police officer with the Salinas Police Department and had been a gang intelligence officer for three years. Rouse had also received training about gangs, and he had previously testified as a gang expert in other cases. Rouse testified for the defense. In part, he testified that the teardrop tattoo had "lost its significance" and "in and of itself, [was] not a gang tattoo." Rouse opined that there was no significance behind whether a teardrop tattoo is filled in or not filled in. Thus, a filled-in teardrop tattoo does not necessarily mean that a gang member has killed someone.

*P. Stipulations*

The parties stipulated that on May 16, 2005, officers showed D.A. a series of photographic lineups that included pictures of defendant and Moreno. D.A. did not identify anyone in the lineups. The parties also stipulated that an analysis of the bullets fired at W.M. and D.A. confirmed that they were fired using the same gun involved in the shooting of Brian Smith, and Smith's shooting took place on December 4, 2004.

Ex. D at 2-24.

## III. DISCUSSION

A.   <u>**Legal** <u>Standard</u></u>

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a); <u>Rose v. Hodges</u>, 423 U.S. 19, 21 (1975).  The writ may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts."  <u>Williams v. Taylor</u>, 529 U.S. 362, 412-13 (2000).  The

United States District Court
Northern District of California

15

only definitive source of clearly established federal law under 28 U.S.C. § 2254(d) is in the holdings (as opposed to the dicta) of the Supreme Court as of the time of the state court decision. <u>Williams</u>, 529 U.S. at 412; <u>Brewer v. Hall</u>, 378 F.3d 952, 955 (9th Cir. 2004). While circuit law may be "persuasive authority" for purposes of determining whether a state court decision is an unreasonable application of Supreme Court precedent, only the Supreme Court's holdings are binding on the state courts and only those holdings need be "reasonably" applied. <u>Clark v. Murphy</u>, 331 F.3d 1062, 1069 (9th Cir.), <u>overruled on other grounds by</u> <u>Lockyer v. Andrade</u>, 538 U.S. 63 (2003).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." <u>Williams</u>, 529 U.S. at 413. "Under § 2254(d)(1)'s 'unreasonable application' clause, . . . a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." <u>Id.</u> at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." <u>Id.</u> at 409. The federal habeas court must presume correct any determination of a factual issue made by a state court unless the petitioner rebuts the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

Here, as noted above, the California Supreme Court summarily denied Petitioner's petition for review. <u>See</u> <u>supra</u> at 2; Ex. E, Dkt. No. 9-3 at 326. The California Court of Appeal, in denying Petitioner's habeas petition, addressed the claims in the instant petition. Ex. D, Dkt. No. 9-3 at 185-234. The Court of Appeal thus was the highest court to have reviewed the claims in a reasoned decision, and it is that decision that this Court reviews herein. <u>See</u> <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 803-04 (1991); <u>Barker v. Fleming</u>, 423 F.3d 1085, 1091-92 (9th Cir. 2005).

United States District Court
Northern District of California

The Supreme Court has vigorously and repeatedly affirmed that under AEDPA, there is a heightened level of deference a federal habeas court must give to state court decisions. See Hardy v. Cross, 565 U.S. 65, 66 (2011) (per curiam); Harrington v. Richter, 562 U.S. 86, 97-100 (2011). As the Court has explained: "[o]n federal habeas review, AEDPA 'imposes a highly deferential standard for evaluating state-court rulings' and 'demands that state-court decisions be given the benefit of the doubt.'" Felkner v. Jackson, 562 U.S. 594, 598 (2011) (per curiam) (citation omitted). With these principles in mind regarding the standard and limited scope of review in which this Court may engage in federal habeas proceedings, the Court addresses Petitioner's claims.

**B**.  **Claims and Analysis**

Petitioner seeks federal habeas relief based on the following claims: (1) due process violation based on the vagueness of California Penal Code §§ 186.22 because it fails to define "member" or "members" as contained therein, Dkt. No. 1 at 9[2]; and (2) failure by the prosecution to disclose all information pertaining to informants serving as witnesses, particularly with respect to their "prior informant activities," so that the defense could ascertain whether such individual has a propensity to fabricate, id. at 8.

1.  **Vagueness**

In a typical facial challenge to the constitutionality of a statute, the challenger must establish that no set of circumstances exists under which the statute would be valid. United States v. Stevens, 559 U.S. 460, 472 (2010). The Due Process Clause "guarantees that ordinary people have fair notice of the conduct a statute proscribes" while "guard[ing] against arbitrary or discriminatory law enforcement." Session v. Dimaya, 138 S. Ct. 1204, 1212 (2018) (quotation s omitted). A law therefore is unconstitutionally vague if it does not provide a reasonable opportunity to know what conduct is prohibited, or is so indefinite as to allow arbitrary and discriminatory enforcement. First Resort v. Herrera,

---

[2] Petitioner also alleged that section 12022.53 was unconstitutionally vague for the same reason, Dkt. No. 1 at 7, but did make this specific claim on appeal. Ex. D. Accordingly, the Court need not address this vagueness challenge to section 12022.53 as it is unexhausted.

860 F.3d 1263, 1274 (9th Cir. 2017).  See id. at 1274-75 (rejecting vagueness challenge of ordinance in § 1983 action where it would be clear to a person of ordinary intelligence what the ordinance as a whole prohibits); Vlasak v. Super. Ct. of Cal., 329 F.3d 683, 688-89 (9th Cir. 2003) (rejecting vagueness challenge under "unreasonable application" clause of AEDPA in habeas action because Supreme Court has rejected vagueness challenges to statutes and court orders that contain same, or similar, terms) (citing Kolender v. Lawson, 461 U.S. 352, 357 (1983)); see also Coates v. City of Cincinnati, 402 U.S. 611, 614 (1971) (statute deemed void for vagueness if it fails to give adequate notice to people of ordinary intelligence of prohibited conduct).

The state appellate court rejected Petitioner's claim challenging the vagueness of section 186.22(b):

> Defendant argues that section 186.22, subdivision (b) is unconstitutionally vague and overbroad because it fails to define the term "members" as used in the statute. As we explain, we find no merit in defendant's arguments.

> ### A.  General Legal Principles and Standard of Review

> Section 186.22, subdivision (b)(1) provides for a sentencing enhancement for persons who are "convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang *members*…." (Italics added.)

> In turn, section 186.22 subdivision (f) defines a "criminal street gang" as "any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the criminal acts enumerated in paragraphs (1) to (25), inclusive, or (31) to (33), inclusive, of subdivision (e), having a common name or common identifying sign or symbol, and whose *members* individually or collectively engage in, or have engaged in, a pattern of criminal gang activity." (Italics added.)

> "'The constitutional interest implicated in questions of statutory vagueness is that no person be deprived of "life, liberty, or property without due process of law," as assured by both the federal Constitution (U.S. Const., Amends. V, XIV) and the California Constitution (Cal. Const., art. I, § 7). Under both Constitutions, due process of law in this context requires two elements; a criminal statute must "'be definite enough to provide (1) a standard of conduct for those whose activities are proscribed and (2) a standard for police enforcement and for ascertainment of guilt."'" (*People v. Morgan* (2007) 42 Cal.4th 593, 605 (*Morgan*).) "A statute is only overbroad if it 'prohibits a "'substantial amount of constitutionally protected conduct."'" (*People v. Rubalcava* (2000) 23 Cal.4th 322, 333.)

United States District Court
Northern District of California

1
2
3
4
5

"A defendant's constitutional challenge to a penal statute may be based on the contention that the law is unconstitutional as applied to him, or he may seek to have it found facially invalid." (*People v. Navarro* (2013) 212 Cal.App.4th 1336, 1348.) "As a general rule, a statute is 'facially unconstitutional' if it conflicts so directly with a constitutional provision that the statue is completely invalid and unenforceable in all circumstances." (*People v. Rodriguez* (1998) 66 Cal.App.4th 157, 166.) "We review questions regarding the constitutionality of a statute de novo." (*People v. Solis* (2020) 46 Cal.App.5th 762, 771.)

6

### B. *Analysis*

7
8
9

Defendant does not specifically argue that section 186.22, subdivision (b) is unconstitutional as applied to him; he argues generally that the statute's failure to adequately define "members" renders it constitutionally infirm. Thus, we interpret his arguments as a facial attack on section 186.22. With this framework in mind, we proceed to analyze his claims.

10
11

First, we reject defendant's contention that the statute is unconstitutionally overbroad….

12
13
14
15
16
17
18
19

Second, we find no merit in defendant's contention that section 186.22 is unconstitutionally vague because it fails to define the term "members." Although the term is not defined within the statute, it is commonly used and no further definition or clarification is required. "'The law is replete with instances in which a person must, at his peril, govern his conduct by such nonmathematical standards as "reasonable," "prudent," "necessary and proper," "substantial," and the like. Indeed, a wide spectrum of human activities is regulated by such terms: thus one man may be given a speeding ticket if he overestimates the "reasonable or prudent" speed to drive his car in the circumstances [citation], while another may be incarcerated in state prison on a conviction of wilful homicide if he misjudges the "reasonable" amount of force he may use in repelling an assault [citation].… "There is no formula for the determination of reasonableness." Yet standards of this kind are not impermissively vague, provided their meaning can be objectively ascertained by reference to common experiences of mankind.'" (*Morgan*, *supra*, 42 Cal.4th at p. 606.)

20
21
22
23
24
25

In *People v. Green* (1991) 227 Cal.App.3d 692 (*Green*), overruled on a different point as stated in *People v. Castenada* (2000) 23 Cal.4th 743, 752 (*Castenada*), the First Appellate District held that section 186.22, subdivision (a), the substantive offense of participation in a criminal street gang, was not unconstitutionally vague. (*Green*, *supra*, at p. 699.) The Court of Appeal rejected the argument that the terms "'actively participates'" and "'members'" were uncertain. (*Ibid.*) *Green* determined that "'[m]embers' and membership' are terms of ordinary meaning, and require no further definition. [Citations.] Further, 'member' has been judicially defined as meaning that a person bears a relationship to an organization that is not accidental, artificial or unconsciously in appearance only." (*Ibid.*)

26
27
28

*Green* acknowledged that "criminal liability may not be predicated on nothing more than membership." (*Green*, *supra*, 227 Cal.App.3d at p. 699.) Section 186.22, however, does not make membership in a criminal gang criminal, it makes, under certain circumstances "active participation" in a criminal street gang criminal. (*Green*, *supra*, at p. 700.) *Green* concluded that "[t]he phrase, in context, has the same meaning as 'active membership' as

defined by the case law. To be convicted of being an active participant in a street gang, a defendant must have a relationship with a criminal street gang which is (1) more than nominal, passive, inactive or purely technical, and (2) the person must devote all, or a substantial part of his time and efforts to the criminal street gang." (*Ibid.*) In fact, in *Castenada*, the California Supreme Court disapproved *Green* and found that it construed section 186.22 too *narrowly* – and that a person who actively participates in a criminal street gang need not devote "'all, or a substantial part of his time and efforts'" to the gang; rather, a person actively participates in a criminal street gang if his or her "'involvement with a criminal street gang… is more than nominal or passive.'" (*Castaneda*, *supra*, 23 Cal.4th at p. 752.)

*Green* also distinguished *Lanzetta v. New Jersey* (1939) 306 U.S. 451, a case that defendant relies upon. (*Green*, *supra*, 227 Cal.App.3d at pp. 701-702.) In *Lanzetta*, the Supreme Court concluded that the phrase "'known to be a member'" of a gang was ambiguous because it immediately "arises the doubt whether actual or putative association is meant." (*Lanzetta*, *supra*, at p. 458.) "If actual membership is required, that status must be established as a fact, and the word 'known' would be without significance. If reputed membership is enough, there is uncertainty whether that reputation must be general or extend only to some persons. And the statute fails to indicate what constitutes membership or how one may join a 'gang.'" (*Ibid.*) Analyzing *Lanzetta*, *Green* concluded that "section 186.22 does not employ the term 'known'; the statute unambiguously refers to actual membership. Moreover, the complaint of the court in *Lanzetta*, that the statute fails to indicate what constitutes membership, was resolved by the case such as [*Scales v. United States* (1961) 367 U.S. 203] which were decided after *Lanzetta*, and which also involved statues failing to specify those acts by which a person might be deemed a member." (*Green*, *supra*, at p. 701.) Relying on *Scales v. United States*, *supra*, 367 U.S. 203, 223, *Green* concluded that "it has been held that a 'member' may not be subjected to criminal liability for the acts of the association to which he is a member unless his membership is 'active,' a term which has been held to be well understood in common parlance." (*Green*, *supra*, at pp. 699-700.)

We find *Green* persuasive and conclude that the use of the term 'member,' which has an ordinary meaning, requires no further definition; thus, the use of the term "member" in section 186.22 does not render the statute unconstitutionally vague. (*Green*, *supra*, 227 Cal.App.3d at pp. 699-701.)

Ex. D at 25-29.

Respondent asserts that federal habeas relief is not warranted where the state court, relying on Green, ultimately applied the due process principles from the United States Supreme Court precedent in Scales to reject Petitioner's vagueness challenge. Dkt. No. 9-1 at 22. Respondent also asserts that Petitioner's reliance on Lanzetta is unavailing because the state appellate court reasoned that Green distinguished Lanzetta. *Id.*

The state court's rejection of this claim was not contrary to, or involved an unreasonable application of, clearly established Federal law. Although it relied on state

precedent in <u>Green</u>, that case analyzed and applied the Supreme Court cases of <u>Lanzetta</u> and <u>Scales</u> in deciding whether the lack of further definition of "member" rendered the statute unconstitutionally vague.  In rejecting Petitioner's reliance on <u>Lanzetta</u>, the state court reasonably distinguished that case from the case at bar based on the fact that section 186.22 "does not employ the term 'known,'" but rather "unambiguously refers to actual membership." Ex. D at 29.  Furthermore, the state court reasonably relied on <u>Scales</u> which also discussed criminal liability based on "active membership" without seeing any further need to define "membership." <u>Id.</u>; <u>see</u> <u>Vlasak</u>, 329 F.3d at 688-89.  Nor can it be said that the lack of a definition for "member" in section 186.22 failed to provide a reasonable opportunity to know what conduct it prohibits or is so indefinite as to allow arbitrary and discriminatory enforcement.  <u>Herrera</u>, 860 F.3d at 1274-75.  Therefore, the state court reasonably rejected this facial challenge to section 186.22 in applying precedent that determined "member" was a term of "ordinary meaning, and require[s] no further definition." Ex, D at 28.  For these reasons, the state appellate court's rejection of this claim was not contrary to, or an unreasonable application of, Supreme Court precedent.  Accordingly, Petitioner is not entitled to relief on this due process claim.

### 2.   **Prosecution's *Brady* Violation**

In <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." <u>Id.</u> at 87.  The Supreme Court has since made clear that the duty to disclose such evidence applies even when there has been no request by the accused, <u>United States v. Agurs</u>, 427 U.S. 97, 107 (1976), and that the duty encompasses impeachment evidence as well as exculpatory evidence, <u>United States v. Bagley</u>, 473 U.S. 667, 676 (1985).  Claims under Brady become ripe, and their factual predicate accrues, when the prosecution discovers and withholds the <u>Brady</u> material, not when the defendant learns of it.  <u>Brown v. Muniz</u>, 889 F.3d 661, 662, 672 (9th Cir. 2018).

Evidence is material if "there is a reasonable probability that, had the evidence been

1    disclosed to the defense, the result of the proceeding would have been different." Cone v.

2    Bell, 556 U.S. 449, 469-70 (2009). "A reasonable probability does not mean that the

3    defendant 'would more likely than not have received a different verdict with the evidence,'

4    only that the likelihood of a different result is great enough to 'undermine confidence in

5    the outcome of the trial.'" Smith v. Cain, 565 U.S. 73, 75 (2012) (quoting Kyles v.

6    Whitley, 514 U.S. 419, 434 (1995). "[E]vidence impeaching an eyewitness may not be

7    material if the State's other evidence is strong enough to sustain confidence in the verdict."

8    Smith, 565 U.S. at 75-76. Compare Turner v. United States, 137 S. Ct. 1885, 1894-95

9    (2017) (finding cumulative effect of withheld impeachment evidence insufficient to

10   undermine confidence in the jury's verdict) with Smith, 565 U.S. at 75-76 (finding

11   impeachment evidence of prosecution's sole witness material). And the mere possibility

12   that undisclosed information might have been helpful to the defense or might have affected

13   the outcome of the trial, does not establish materiality under Brady. United States v.

14   Olsen, 704 F.3d 1172, 1184 (9th Cir. 2013). In sum, for a Brady claim to succeed,

15   petitioner must show: (1) that the evidence at issue is favorable to the accused, either

16   because it is exculpatory or impeaching; (2) that it was suppressed by the prosecution,

17   either willfully or inadvertently; and (3) that it was material (or, put differently, that

18   prejudice ensued). Banks v. Dretke, 540 U.S. 668, 691 (2004); Strickler v. Greene, 527

19   U.S. 263, 281-82 (1999).

20        Respondent argues that the state court reasonable rejected Petitioner's *Brady* claim

21   on direct review. Dkt. No. 9-1 at 23.

22        The state appellate court denied this claim:

23        Defendant argues that the trial court erred when it denied his pretrial
     motion for discovery of all information relating to the prior informant activities

24   of the prosecution's witnesses. We conclude that the trial court did not abuse
     its discretion by denying the motion because there was no evidence that the

25   prosecutor did not comply or did not intend to comply with his obligations
     under *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*) and section 1054.1.

26

27        ***A. Background***

28        On October 12, 2017, defense counsel filed a pretrial discovery motion
     seeking "discovery of all reports, documents, writings, recordings and

statements (whether written or oral) of 'all informant activities' of all individuals whom the prosecution intend[ed] to call at trial to testify about matters going to the issue of" defendant's guilt. The motion defined all prior informant activities as "any and all prior informant activities that occurred at any time before the informant testifies at the trial in this matter, and not merely prior informant activities that occurred before the alleged crime in this case was committed, or prior informant activities that occurred before defendant was arrested in connection with the case, or prior informant activities that occurred before the filing of any accusatory pleading in this case." Defense counsel also sought "discovery of all the police reports, transcripts and recordings generated in any and all of the investigations and cases in which the person who engaged in the 'prior informant activities' gave the police that prior information whether or not those investigations or cases (1) have been completed or closed, (2) remain open, (3) are the subject of continuing investigation, or (4) pending trial at this time."

On November 20, 2017, the trial court held a hearing on the matter. Defense counsel argued: "The best way to know whether these people have a history of lying is to look at the statements they gave in relation to the overall case investigation [in prior cases[ to see whether these people, these informants on these other cases are now being used in this case have statements that are just totally inconsistent with what the reports show in those cases. Whether they are completed cases, ongoing cases, cold cases. And that would be very critical information to confront them with at trial in this case."

In response, the trial court stated: "[Y]our motion and what you're asking me to do assumes that the District Attorney's going to ignore its *Brady* obligations," and that if the prosecutor came across a statement made by an informant that "has been proven to be demonstratively false[, the prosecutor is] not going to turn that over to you." Defense counsel stated that he wanted to review the materials because "[s]ometimes defense attorney's analysis of what is or isn't inconsistent is different from a prosecution's point of view." The prosecutor agreed with the trial court's analysis and stated that "if [he] did see something like that [evidence that would exonerate the defendant or impeach a witness], absolutely the information should be turned over."

Thereafter, the trial court denied defense counsel's motion, reasoning as follows: "The People are required to comply with their *Brady* obligations and produce all exonerating or impeaching information that they have knowledge of. They're required to review their records and files to determine whether or not that the informants have provided false information in other cases. And if they do, I'm confident they'll comply with those obligations. But I'm not going to issue an order compelling them to produce records and reports in all cases in which these informants have provided information."

### B. General Legal Principles and Standard of Review

*Brady* held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." (*Brady, supra*, 373 U.S. at p. 87.) "The [United States Supreme Court] has since held that the duty to disclose such evidence exists even though there has been no request by the accused [citation[, that the duty encompasses impeachment evidence as well as exculpatory evidence [citation], and that the duty extends even to evidence known only to police investigators

23

and not to the prosecutor [citation]. Such evidence is material '"if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."' [Citation.] In order to comply with *Brady*, therefore, 'the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in this case, including the police.'" (*People v. Salazar* (2005) 35 Cal.4th 1031, 1042 (*Salazar*).)

"Section 1054.1 (the reciprocal-discovery statute) 'independently requires the prosecution to disclose to the defense… certain categories of evidence "in the possession of the prosecuting attorney or [known by[ the prosecuting attorney… to be in the possession of the investigating agencies."' [Citation.] Evidence subject to disclosure includes '[s]tatements of all defendants] (§ 1054.1, subd. (b)), '[a]ll relevant real evidence seized or obtained as a part of the investigation of the offenses charged' (*id.*, subd. (c)), any '[r]elevant written or recorded statements of witnesses or reports of the statements of witnesses whom the prosecutor intends to call at the trial, including any reports or statements of experts' (*id.*, subd. (f)), and '[a]ny exculpatory evidence' (*id.*, subd. (e))." (*People v. Verdugo* (2010) 50 Cal.4th 263, 279-280.)

"[A]buse of discretion is generally the proper standard of appellate review on matters regarding discovery in criminal cases." (*People v. Ashraf* (2007) 151 Cal.App.4th 1205, 1212.) *Brady* claims are subject to the independent standard of review. (*Salazar, supra*, 35 Cal.4th at p. 1042.)

### C. Analysis

Defendant argues that the trial court erred in denying his discovery motion because an informant can be impeached by evidence that he or she provided inconsistent of false facts in prior cases. Defendant, however, does not argue that the prosecutor violated his *Brady* obligations, or that there was exculpatory or impeaching evidence that was not disclosed to the prosecution in this case. Defendant's motion essentially asked the trial court to mandate that the prosecutor disclose *all* information about informants – not just relevant information – and have *defense counsel*, not the prosecutor, review the materials to determine whether the evidence was exculpatory or impeaching.

The prosecutor, however, acknowledged that he was aware of his *Brady* obligations, and he agreed that evidence that an informant made a false statement in a prior investigation would be turned over to the defense. Here, there is nothing to indicate that the prosecutor intended to ignore his duty under *Brady* and would suppress material evidence favorable to the defense. (*Brady, supra*, 373 U.S. at p. 87.) Furthermore, the evidence requested by defense counsel exceeded the scope of section 1054.1, which requires disclosure of "exculpatory evidence" (*id.*, subd. (e)) and "[r]elevant written or recorded statements of witnesses" (*id.*, subd. (f)).  Prior informant activities where the informant provided relevant, consistent information to the police would not have been relevant or exculpatory because it would not have impeached the informant's credibility.

Defendant relies on *Maxwell v. Roe* (9th Cir. 2010) 628 F.3d 486 (*Maxwell*). In *Maxwell*, a jailhouse informant denied that he previously worked as an informant and stated that he had never testified for the district attorney, representing himself as "someone new to the informant world.'" (*Id.* at p. 511.) The defendant filed a petition for a writ of habeas corpus after he was

1  convicted, and the trial court held an evidentiary hearing on whether the
2  jailhouse informant had given false testimony. (*Id.* at pp. 493-494.) At the
   evidentiary hearing, it was revealed that the prosecution had not disclosed that
3  the jailhouse informant had aided in several investigations and had acted as an
   informant on numerous previous occasions. (*Id.* at p. 511.) The Ninth Circuit
4  concluded that evidence of the informant's prior dealings could have been used
   to discredit the informant at trial. (*Id.* at pp. 511-512.) Thus, the failure to
5  disclose information about the informant amounted to a *Brady* violation.
   (*Maxwell*, *supra*, at pp. 511-512.)

6      *Maxwell* does not aid defendant. The decision in *Maxwell* took place after
   an evidentiary hearing where evidence was presented that the prosecutor failed
7  to disclose relevant, exculpatory information, which could have impeached the
   informant's credibility. (*Maxwell*, *supra*, 628 F.3d at pp. 493-494.) Here, there
8  is no evidence that the prosecutor withheld exculpatory information.
   Furthermore, defendant cites to no authority for the proposition that the
9  prosecution is required to disclose evidence that is not relevant to the case, or
   that it is the duty of defense counsel, not the prosecutor, to examine the
10 materials available to the prosecutor to determine whether exculpatory
   evidence exists. [Footnote omitted.]

11
12     Accordingly, the trial court did not abuse its discretion when it denied
   defendant's discovery motion. [FN19 As we have stated, *Brady* claims are
13 subject to the independent standard of review. (*Salazar*, *supra*, 35 Cal.4th at p.
   1042.) However, as explained above, there is no evidence that a *Brady*
14 violation occurred. Thus, there is no *Brady* claim for us to review, and we
   apply the abuse of discretion standard to the trial court's denial of defendant's
15 discovery motion. (*People v. Ashraf*, *supra*, 151 Cal.App.4th at p. 1212.)]
   (*People v. Ashraf*, *supra*, 151 Cal.App.4th 1205.)

16 Dkt. No. 1-2 at 50.

17     The state appellate court's rejection of this claim was not unreasonable.  First of all,

18 there is no indication that Petitioner had a ripe claim under <u>Brady</u> because there is no

19 evidence that the prosecution actually discovered and withheld specific <u>Brady</u> material, or

20 that defendant learned of the existence of such evidence.  In fact, Petitioner has not

21 satisfied the three requirements of a <u>Brady</u> claim: (1) he fails to point to specific evidence

22 of any informant's activities that was favorable to him; (2) there is no evidence that the

23 prosecution willfully or inadvertently suppressed that evidence; and (3) he has failed to

24 show that such evidence was material, *i.e.*, that there is a reasonably probability that had

25 the evidence been disclosed to the defense, the result of the proceeding would have been

26 different.  See <u>Banks</u>, 540 U.S. at 691; <u>Cone</u>, 556 U.S. at 469-70.  Rather, Petitioner

27 sought to have the prosecution turn over "*all* informant activities," regardless of its

28 relevance, so that the defense counsel could determine whether any of it was exculpatory

United States District Court
Northern District of California

1

2

3

4

5

or impeaching. Failure to do so does not amount to a <u>Brady</u> violation. It appears that defense counsel was simply speculating that a review of <u>all</u> informant activities would yield impeaching evidence. But the mere possibility that undisclosed information *might* have been helpful to the defense does not establish materiality. See <u>Olsen</u>, 704 F.3d at 1184.

6

7

8

9

10

11

12

13

14

15

16

17

Furthermore, Petitioner's reliance on <u>Maxwell</u> is unavailing because that case is distinguishable from the case at bar. Specifically, <u>Maxwell</u> involved an evidentiary hearing which revealed that the prosecutor failed to disclose relevant, exculpatory information which could have impeached the informant's credibility. <u>Id.</u> at 39. Petitioner also cites to <u>Killian v. Poole</u>, 282 F.3d 1204 (9th Cir. 2002), which also involved specific undisclosed exculpatory evidence which violated <u>Brady</u>. Dkt. No. 1 at 11. Here, unlike in <u>Maxwell</u> and <u>Killian</u>, there was *no* evidence that the prosecutor failed to disclose any specific exculpatory information. <u>Id.</u> at 40. Lastly, the prosecution acknowledged to the trial court that he understood his <u>Brady</u> obligations, and agreed that if he did see material evidence, "absolutely the information should be turned over." Ex. D. at 37. There is no evidence that the prosecution intended to do otherwise, and then actually suppressed exculpatory evidence.

18

19

20

21

Petitioner did not argue in the federal petition that the trial court erred in denying his discovery motion under California Penal Code section 1054.1. Dkt. No. 1. Accordingly, the Court need not address this claim which Respondent asserts is not cognizable on federal habeas as it is violation of state law. Dkt. No. 9-1 at 28.

22

23

24

For the foregoing reasons, the state appellate court's rejection of this claim was not contrary to, or an unreasonable application of, Supreme Court precedent. Accordingly, Petitioner is not entitled to relief on this <u>Brady</u> claim.

25

### IV.  CONCLUSION

26

27

After a careful review of the record and pertinent law, the Court concludes that the Petition for a Writ of Habeas Corpus must be **DENIED**.

28

1       Further, a Certificate of Appealability is **DENIED**.  <u>See</u> Rule 11(a) of the Rules

2 Governing Section 2254 Cases.  Petitioner has not made "a substantial showing of the

3 denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  Nor has Petitioner demonstrated

4 that "reasonable jurists would find the district court's assessment of the constitutional

5 claims debatable or wrong."  <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000).  Petitioner may

6 not appeal the denial of a Certificate of Appealability in this Court but may seek a

7 certificate from the Court of Appeals under Rule 22 of the Federal Rules of Appellate

8 Procedure.  <u>See</u> Rule 11(a) of the Rules Governing Section 2254 Cases.

9       The Clerk shall terminate any pending motions, enter judgment in favor of

10 Respondent, and close the file.

11       **IT IS SO ORDERED**.

12 Dated: January 7, 2025

EDWARD J. DAVILA
United States District Judge